UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-61841-CIV-COHN/SNOW

ELIZABETH AND JAMES MELLOR,
as Co-Administrators of the Estate of Jason Mellor,

    Plaintiffs,

vs.

JENS PETER MOE, KURT MELNECHUCK,
and 30 FOOT WELLCRAFT SCARAB KNOWN
AS "BAHAMA BOOM", JOHN DOES 1-10,
and ABC, Inc. 1-10,

    Defendants.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE is before the Court upon the bench trial held on September 17, 2007.  The Court has carefully considered the credibility of the witnesses presented and the evidence admitted during the trial.  The Court has also considered Plaintiffs' Proposed Findings of Fact and Conclusions of Law [DE 46], Defendant Jens Peter Moe's Proposed Findings of Fact and Conclusions of Law [DE 49], Defendant Moe's Motion to Dismiss for Lack of Jurisdiction [DE 44], Plaintiffs' Response thereto [DE 52], Plaintiffs' Trial Brief [DE 47], Defendant's Trial Memorandum [DE 53] and Plaintiffs' Response to Defendant's Trial Memorandum [DE 54].

### I.  BACKGROUND

Plaintiffs Elizabeth and James Mellor ("Plaintiffs") filed this Death on the High Seas Act ("DOSHA") against Defendant Jens Peter Moe ("Moe"), Kurt Melnechuck, the vessel, and various unnamed Defendants.  All Defendants except for Mr. Moe were dismissed for failure to serve [DE 34].  Plaintiffs are the parents of Jason Mellor, who

was killed while riding a jetski on August 29, 2003.  Jason was 21 at the time of his death.  The accident occurred near Cable Beach in the vicinity of Paradise Island, Nassau, Bahamas.  Jason collided with a 30' twin-outboard "Scarab" vessel owned and operated by Defendant Jens Peter Moe.  Plaintiffs assert a single claim under DOSHA, alleging that Defendant was negligent in operating his vessel.  Defendant denies that he was negligent, and also disputes that DOSHA is applicable to this action.

Accordingly, pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law.

## II.  FINDINGS OF FACT[1]

1. The decedent, Jason Mellor was 21 years old at the time of the accident which gave rise to this lawsuit.  Plaintiff's Exhibit 1.

2. The accident occurred on August 29, 2003 approximately 500-600 yards off shore a resort area known as "Cable Beach," a part of Nassau in the Bahamas.  Plaintiff's Exhibit 6.

3. Jason and his family had spent the previous two hours on a beach known as Blackbeards Cay.

4. The Mellors were on a cruise which departed from Florida, having arrived on that beach from an excursion ferry off the cruise ship docked at Nassau.

5. Jason and his brother rented jetskis from a vendor on this island.  Plaintiff's Exhibit 5.

---

[1] Any of the foregoing factual findings that may represent conclusions of law are adopted as conclusions of law.

6. That part of the island and beach is owned by the cruise ship operator.

7. Jason was operating a jetski with Kerry Mitchell as his passenger.

8. Jason's brother, John Mellor, was operating another jetski with Shannon Mitchell as his passenger. John had never been on a jetski before.

9. The two jetskis departed the beach toward the open water. After only five minutes, they stopped to wipe their eyes or clean their glasses from the saltwater. Then they started up again.

10. John followed Jason by about 40 to 60 feet, both before and after their stop.

11. The accident occurred at about 3:30pm.

12. At the time of the accident, the weather was turning darker and a rain squall was approaching.

13. At the point they started up again after the initial stop, Shannon Mitchell testified that she saw a boat traveling at a 90 degree angle to them going faster than the jetskis.

14. John Mellor testified that upon starting up again after clearing his glasses, he kept the same following distance, course, and speed of about 15 miles per hour.

15. John saw Defendant's boat out of the corner of his eye, about 100 feet away to his left, traveling about twice as fast as the jetskis.

16. Mr. Moe testified that he was traveling east to west, returning to port to avoid the rain coming from the south, at about 20-25 miles per hour.

17. Mr. Moe's vessel was a 30' twin-outboard "Scarab" type (hereinafter, "vessel"). Plaintiff's Exhibit 4.

18. On cross-examination, John indicated via a diagram made in Court by

   Defendant's counsel that the jetskis were at about a 45 degree angle to the right of the Defendant's vessel. The vessel was heading west.

19.  John saw the vessel about 2 to 3 seconds before the right side of the vessel hit the left side of his brother's jet ski.

20.  The Court takes judicial notice that a mathematical conversion of miles per hour to feet per second yields a ratio of 1 mile per hour equaling 1.4666667 feet per second.[2]

21.  If John was following Jason by about 50 feet at 15 miles per hour, he was in fact 22 feet per second behind Jason, confirming his testimony that he was 2 to 3 seconds behind Jason if traveling at 15 mph.

22.  If the boat was 100 feet away from John and Shannon when they saw it, it would be closer to Jason and Kerry on the lead jetski. In fact, if the jetskis were traveling at 15 miles per hour, the vessel would be approximately 87.5 feet from Jason's jetski, again taking John's testimony regarding the angle of the approach.

23.  Assuming both the vessel and the jetskis continued on their course, the vessel would travel 100 feet to reach the same point that the lead jetski would reach in 2.5 seconds.

24.  If the boat was traveling at 25 miles per hour as testified to by Defendant Moe, in 2.5 seconds it would in fact travel 90 feet. At 27 miles per hour, the vessel would travel 99 feet in 2.5 seconds.

---

[2] There are 3600 seconds in an hour (60 minutes x 60 seconds), and there are 5,280 feet in a mile. Dividing 5280 feet by 3600 yields a ration of 1.4666667 feet per second.

25. These findings, however, cannot actually determine the speed of the jetskis, though if John's testimony is credible about his following distance and the distance to the vessel, then the remaining calculations are accurate.

26. The Court finds that John's testimony is credible. If the jetskis were traveling at 15 mph, the vessel was going about 27 miles per hour, all depending upon some deviation of the actual angle of approach between the vessel and the jetskis.

27. Defendant Moe testified that he did not see the jetskis until impact.

28. Moe testified that they appeared to come from behind and to the right, implying that their speed was faster than his speed.

29. Kurt Melnechuck, a friend of Moe who was riding in the vessel with him on that day, testified that he saw the jetski a "split-second" before impact.

30. Melnechuck also stated that they were traveling 20-25 miles per hour, just ahead of the storm, and that the vessel's top speed was 45 miles per hour.

31. While this statement is credible, he also stated that the jetskis were traveling faster than their vessel, which is unknown and in contradiction to John Mellor and Shannon Mitchell's testimony.

32. Moe testified in his deposition that the storm clouds ("squall") were moving from south to north.

33. The rain did not reach the vessel until after the accident, with clear visibility in front of the vessel and clouds with rain behind the vessel.

34. John Mellor testified that the rain was coming from his left, which would be from behind the vessel.

35. Moe's visibility in seeing objects behind him may have been somewhat inhibited

5

   due to the dark clouds in that direction.

36. Moe knew that there were large cruises with tourists renting jetskis and driving boats in that area.

37. The jetskis were to the right of the vessel, the vessel was traveling faster than the jetskis, and the vessel was larger than the jetskis.

## Damages

38. The Mellors bought a larger house in 2001, primarily for the purpose of having more space for Jason and John to have friends over and be comfortable with living in that house for many years.

39. Jason began bicycling with his father from age 12 until he became an older teenager, at which point when he had a driver's license he became interested in motorcycling with his father.

40. Jason helped around the house mowing the lawn, shoveling snow, caring for the dogs, and driving his brother to dentist appointments and friend's houses.

41. Jason reserved Sundays for his family, and worked outside the home beginning at age 12.

42. Jason was one class short of finishing community college and had applied for four-year university admission. Plaintiff's Exhibit 9.

43. Jason was always available to his family for advice and often helped around the house on the many Sundays that he was home.

44. He was claimed by his parents as a dependent. Defendant's Exhibit 2.

45. There was no evidence that Jason contributed financially to the household from his earnings of approximately $8,000 per year. Plaintiff's Exhibits 2 and 3.

46. Jason did, however, perform services around the house as described above.

47. Kenneth Betz, M.A., Plaintiffs' expert in forensic economics, testified that Jason's services were worth $18.50 per hour, and that he worked around the house an average of 6 hours per week for his parents, for a total of $5,772 per year.

48. Plaintiffs have 13.8 years until retirement at age 65, with a further life expectancy of another 12.7 years after age 65.

49. Kenneth Betz testified that beginning at Plaintiffs' age of 65, Jason would increase his hours of services to his parents to 12 hours a week.

50. Betz further testified that those post-age 65 years old services would include "professional" advice, which raises the worth of those services to $36.75 per hour.

### III. CONCLUSIONS OF LAW

#### A. Jurisdiction

Plaintiff maintains that this Court has jurisdiction pursuant to DOSHA because the incident occurred on the high seas, or in the alternative, 46 U.S.C. § 764, recodified at 46 U.S.C. § 30306, provides jurisdiction to this Court by applying Bahamian law. Defendant asserts that because the accident occurred in Bahamian waters, and not the "high seas," DOSHA does not apply. The statute itself does not define "high seas," and courts have interpreted the statute in different ways.

In the principal case relied upon by Defendant, the Court did not decide the issue faced in this case. The Second Circuit stated that: "We take no position on what courts should do when faced with the difficult question of whether to apply DOHSA in foreign territorial waters, where plaintiffs might otherwise be left with only foreign

7


remedies in foreign courts." In re Air Crash Off Long Island, New York, on July 17, 1996, 209 F.3d 200, 212 (2nd Cir. 2000). Although the dicta in that decision appears to generally support Defendant's position that "high seas" has been defined by some courts to not include foreign territorial waters, the opinion itself did not decide this issue.

Plaintiffs rely on several other decisions, some from this Circuit, that extend DOSHA jurisdiction to foreign territorial waters, including a case almost directly on point from this District. In Moyer v. Rederi, 645 F.Supp. 620 (S.D.Fla. 1986), then U.S. District Judge Stanley Marcus held that a negligence action filed by the estate of a cruise ship passenger who suffered a heart attack while snorkeling in Mexican waters was covered under DOHSA. In Sanchez v. Loffland Bros. Co., 626 F.2d 1228, 1230, n.4 (5th Cir. 1980), the "old" Fifth Circuit stated that DOSHA is applicable when the cause of action arises within the territorial waters of a foreign country, including a lake in Venezuela. This decision remains binding on this Court.[3] Finally, in Ford v. Wooten, 681 F.2d 712, 716 (11th Cir. 1982), the Eleventh Circuit concluded without discussion, that DOSHA applied to a death in the Bahamas (Court held that DOSHA would control to the exclusion of other maritime remedies).

Because these decisions provide sufficient authority for the Court to conclude that DOSHA applies to this death in Bahamian territorial waters, the Court need not discuss the cases from other Circuits relied upon by Plaintiffs. Nor need the Court discuss Plaintiffs' alternative argument that this Court has jurisdiction to apply

---

[3] The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the Circuit. Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Bahamian law under 46 U.S.C. § 764, recodified at 46 U.S.C. § 30306.

In Moyer, the Court also analyzed whether "the cause of action bears a significant relationship to traditional maritime activity, a requisite for admiralty jurisdiction under *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249 (1972)." 645 F.Supp. at 624-25. The Court found that the significant relationship test was met because the decedent was a paying passenger aboard a cruise ship sailing from Florida to Mexico which arranged maritime recreational activities for its passengers. 645 F.Supp. at 626-27. The only difference between Moyer and the case at bar is that the Moyer defendants included the cruise ship and its agents operating the excursion, rather than the third-party defendant tortfeasor as in this case. This Court concludes that the status of the Defendant herein does not change the result -- this case is in admiralty and is covered under DOSHA.

### B.  DOSHA Claim

The United States Supreme Court has described DOSHA as follows:

> DOHSA limits the class of beneficiaries to the decedent's wife, husband, parent, child, or dependent relative, 46 U.S.C. § 761, establishes a 3-year statute of limitations period, § 763a, allows a suit filed by the victim to continue as a wrongful death action if the victim dies of his injuries while suit is pending, § 765, provides that contributory negligence will not bar recovery, § 766, and declares that "recovery ... shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought...." § 762.

Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 215, 106 S.Ct. 2485, 2490 (1986).

In 2006, DOSHA was recodified to 46 U.S.C. § 30301 et seq.

Applying DOSHA to this case, the Court must determine the comparative

negligence of Defendant and the decedent.[4]  Plaintiffs chiefly rely on Rule 15 of the International Regulations for Preventing Collisions at Sea (hereinafter, "COLREGS"), which states that: "When two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way and shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel."  International Rule 15 (formerly codified at 33 U.S.C.A. foll. § 1602 (1996)).[5]  In other words, because the jetskis were on the right side of the vessel, the vessel should have yielded to the jetskis.

Defendant relies upon Rule 13 regarding overtaking vessels.  Rule 13 states:

(a) Notwithstanding anything contained in the Rules of Part B, Sections I and II, any vessel overtaking any other shall keep out of the way of the vessel being overtaken.
(b) A vessel shall be deemed to be overtaking when coming up with another vessel from a direction more than 22.5 degrees abaft her beam, that is, in such a position with reference to the vessel she is overtaking, that at night she would be able to see only the sternlight of that vessel but neither of her sidelights.
(c) When a vessel is in any doubt as to whether she is overtaking another, she shall assume that this is the case and act accordingly.
(d) Any subsequent alteration of the bearing between the two vessels shall not make the overtaking vessel a crossing vessel within the meaning of these Rules or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.

Defendant argues that because the jetskis were attempting to overtake the

---

[4] The Court notes that a comparative negligence analysis would also result if this Court found jurisdiction to apply Bahamian law under 46 U.S.C. § 764, recodified at 46 U.S.C. § 30306.

[5] The COLREGS formerly were published at 33 C.F.R. § 80 and following 33 U.S.C.A. § 1602.  However, on April 1, 1996, the Coast Guard determined that it no longer needed to publish the COLREGS in the CFR because they were also published in the United States Code.  However, the United States Code subsequently decided not to carry these regulations, so they are only available in prior editions via Westlaw.com.  The Bahamas has also adopted these Rules.

vessel, the jetskis had the burden to stay out of the way of Moe's vessel.  However, the Court found above that based upon the preponderance of the evidence and the weighing of credibility, the vessel was traveling faster than the jetskis, not the other way around.  Therefore, based upon Rules 13 and 15, the vessel is at least in part to blame for this accident.

However, the COLREGS also state that "[a] vessel the passage of which is not to be impeded remains fully obliged to comply with the rules of this part when the two vessels are approaching one another so as to involve risk of collision."  International Rule 8(f)(iii) (formerly codified at 33 U.S.C.A. foll. § 1602 (1996)).  As with any standard of reasonableness, this Rule means that despite having the right of way according to the COLREGS, the jetskis should have taken action to avoid the collision.  Sawyer v. McDonald, 165 F.2d 426, 429-430  (5th Cir. 1948) (privileged vessel still at partial fault for failing to avoid collision) (interpreting earlier version of Rules).

John Mellor and Shannon Mitchell testified that they saw the vessel 100 feet away.  Though the vessel was traveling at almost twice the speed of the jetskis, there still were a few seconds for the lead jetski to avoid the vessel. If Shannon Mitchell is correct that the angle of the vessels was 90 degrees, on a cloudy but not raining afternoon, then the conclusion that the lead jetski shares negligence in causation of this accident is bolstered even further as there would be a greater opportunity to see the vessel prior to the collision.  This analysis assumes that the lead jetski did not accelerate or change course in an attempt to overtake the vessel, as suggested by Defendant.

The Court therefore concludes that the vessel and the lead jetski share equally

in the fault which caused this avoidable accident. Thus, the decedent's comparative negligence is 50%. The Court will reduce the damages described below accordingly.

### C.  Damages

Under DOSHA, damages are limited to fair compensation for the pecuniary damages of the parents of Jason Mellor.  46 U.S.C. § 30303.  Plaintiffs Elizabeth and James Mellor testified about the loss of services, both emotional and tangible, that Jason provided to them as their son, and as an older brother to John, who was 16 at the time of the accident.  Although emotional support or services are not compensable under DOSHA, the pecuniary loss of Jason's services in mowing the lawn, shoveling snow, caring for the dogs, and driving his brother to dentist appointments and friend's houses is compensable.  Gray v. Lockheed Aeronautical Systems, 155 F.3d 1343 (11th Cir. 1998) (affirming remainder of prior damages decision, 125 F.3d 1371, 1381 (11th Cir. 1997), after reversing pain and suffering damages following remand from United States Supreme Court); Matter of Adventure Bound Sports, Inc., 858 F.Supp. 1192, 1201 (S.D.Ga. 1994).  Because Jason was listed as a dependent on his parents' tax return and there was no evidence that he contributed financially to his parents (other than what they would have spent replacing his services), the sole measure of damages in this case is the value of his services, as well as the cost of funeral and burial arrangements.  Adventure Bound Sports, 858 F.Supp. at 1202 (funeral expenses are pecuniary loss if paid by plaintiffs (unless paid by estate)).

According to Plaintiff's expert, Kenneth Betz, the value of those current services is $18.50.  Although Defendant contests this entire method of determining damages, Defendant did not put on evidence to contradict this expert conclusion as to the hourly

12

cost of these services. The Court concludes that this is a reasonable amount for the services provided at the time of death. The Court also concludes that the testimony presented at trial is sufficient to establish that Jason provided six hours of services per week that his parents otherwise would have had to pay someone to perform.

However, the evidence presented at trial did not establish that those services would increase in amount or in type after Plaintiffs reached age 65. Mr. Betz's testimony as to "advice" services and the cost of those services is purely speculative. While one might assume that Jason would help his parents more once they reached age 65, it is also reasonable to assume that his hours helping them would decrease once he started his own family. The Court is bound by the testimony provided at trial.

Therefore, the Court concludes that fair and just compensation for the pecuniary loss sustained by Plaintiffs is $5,772 per year for the 26.5 years of their life expectancy, for a total of $152,958, plus the cost of the funeral and burial at $14,796.16,[6] then reduced by 50% for a total damage award of $83,877.08.

## IV.  CONCLUSION

The Court shall separately enter a final judgment in favor of Plaintiffs based upon these findings of fact and conclusions of law.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this 27th day of September, 2007.

*James I. Cohn*
JAMES I. COHN
United States District Judge

---

[6] This amount is derived from adding the costs described in Plaintiff's Exhibits 15 through 21. The tombstone cost in Exhibit 19 is divided by three as it represents the cost of a 3 person headstone.

13

cc: Mark Davis, Esq./Paul Daly, Esq.

Edward Curtis, Esq.

14